IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NO. BK16-40787 |
| CORNERSTONE TOWER SERVICES, INC., | ) | A17-4051 |
| | ) | |
| Debtor(s). | ) | CHAPTER 11 |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS, in its capacity as assignee of | ) | |
| Debtor in Possession, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LG FUNDING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

This matter is before the court on motions for summary judgment filed by the defendant (Fil. No. 11) and the plaintiff (Fil. No. 14). Elizabeth A. Hoffman and Donald L. Swanson represent the plaintiff, and Gene W. Rosen represents the defendant. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motions were taken under advisement without oral arguments.

Both motions are denied, and this case will be scheduled for trial.

The creditors' committee filed this adversary proceeding to recover approximately $19,000 in alleged preferential transfers under a "merchant cash advance" ("MCA") agreement between LG Funding and the debtor. The question the parties bring to the court on cross-motions for summary judgment is whether the agreement was a sale of assets or a financing arrangement. The plaintiff argues that it is a financing agreement with an exorbitant rate of interest and the daily payments of a percentage of the debtor's receipts as the company neared bankruptcy constitute preferential transfers under the Bankruptcy Code. LG Funding, LLC ("LG"), argues it purchased certain of the debtor's future receivables at a discounted price and the daily payments under this funding arrangement should be considered to be in the ordinary course of business for the debtor and thus not an avoidable preference.

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g., Celotex Corp. v. Catrett,*

477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are the province of the fact-finder at trial and not of the judge at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 255.

The following facts are uncontroverted for purposes of these motions:

1.  Cornerstone Tower Services, Inc. ("Cornerstone"), was formed in 1997 and is in the business of erecting and maintaining communication towers, such as cell phone towers.

2.  Cornerstone filed a Chapter 11 bankruptcy petition on May 13, 2016.

3.  The Official Committee of Unsecured Creditors ("Committee" or "the plaintiff") is acting on behalf of Cornerstone. The Committee was assigned "[a]ll avoidance claims under Chapter 5 (11 U.S.C. § 501 et al.)" pursuant to the terms of the Second Amended Plan confirmed in the underlying bankruptcy case on May 26, 2017.

4.  Cornerstone entered into an MCA agreement with LG, dated February 29, 2016, and executed on March 1, 2016. The agreement executed by the parties was based on LS's standard form contract for MCA transactions.

5.  The terms of the merchant agreement provide:

[Cornerstone] hereby sells, assigns and transfers to LG (making LG the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of [Cornerstone's] future accounts, contract rights and other obligations arising from or relating to the payment of monies from [Cornerstone's] customers and/or other third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of [Cornerstone's] business) for the payment of [Cornerstone's] sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by [Cornerstone] to LG.

The Purchased Amount shall be paid to LG by [Cornerstone's] irrevocably authorizing [a depository account] to remit the percentage specified below (the "Specified Percentage") of [Cornerstone's] settlement amounts due from each transaction, until such time as LG

-2-

receives payment in full of the Purchased Amount. [Cornerstone] hereby authorizes LG
to ACH Debit the specified remittances from [Cornerstone's] bank account on a daily
basis . . . .

Purchase Price: $50,690.00 Specified Percentage: 5% Receipts Purchased Amount:
$65,897.00

6. On March 3, 2016, LG paid Cornerstone the purchase price, less an origination fee of $690.

7. Pursuant to an addendum to the Merchant Agreement, the ACH debits had a per-month limit:
"LG Funding agrees not to take more than $10,982.00 per month."

8. The monthly limit translates to an approximately $500.00 limit on each business day's
withdrawal and daily withdrawals from Cornerstone's account were, in fact, limited to $500.00 per day.

9. On and after March 3, 2016, Cornerstone had the capacity to pay at or near the $500.00
per-business-day maximum amount. Here are the per-day withdrawal amounts under the MCA, totaling
$19,242.43:

| Date & Amount | | Date & Amount | | Date & Amount | |
|---|---|---|---|---|---|
| 3/8 | $479.98 | 3/9 | $485.85 | 3/11 | $489.85 |
| 3/14 | $486.58 | 3/15 | $488.10 | 3/16 | $490.12 |
| 3/17 | $485.25 | 3/18 | $485.85 | 3/21 | $495.95 |
| 3/22 | $490.55 | 3/23 | $490.50 | 3/25 | $499.00 |
| 3/28 | $499.00 | 3/29 | $499.00 | 3/30 | $500.00 |
| 3/31 | $500.00 | 4/1 | $500.00 | 4/4 | $500.00 |
| 4/5 | $500.00 | 4/6 | $500.00 | 4/7 | $500.00 |
| 4/8 | $500.00 | 4/11 | $488.85 | 4/12 | $499.20 |
| 4/13 | $488.80 | 4/14 | $500.00 | 4/15 | $500.00 |
| 4/18 | $500.00 | 4/19 | $500.00 | 4/20 | $500.00 |
| 4/21 | $500.00 | 4/22 | $500.00 | 4/25 | $500.00 |
| 4/26 | $500.00 | 4/27 | $300.00 | 4/28 | $300.00 |
| 5/2 | $300.00 | 5/3 | $300.00 | 5/4 | $300.00 |

| 5/5 | $300.00 | | 5/6 | $300.00 | | 5/9 | $300.00 |
|---|---|---|---|---|---|---|---|

10. There were 42 daily automatic withdrawals from Cornerstone's account, paid to LG, during the 90-day preference period. The first eleven payment amounts fluctuated in the upper $400s as follows – $479.98, $485.85, $489.85, $486.58, $488.10, $490.12, $485.25, $485.85, $495.95, $490.55 and $490.50 respectively.

11. Thereafter, however, the daily withdrawal amounts turned to rounded numbers (with three exceptions) as follows:

    a. The next three payments were in the amount of $499.00 each;
    b. The next eight payments were in the amount of $500.00 each;
    c. The next three payments were for $488.85, $499.20 and $488.80 respectively;
    d. The next nine payments were in the amount of $500.00 each; and
    e. The last eight payments were in the amount of $300.00 each.

12. The change in payment amounts from $500.00 to $300.00 on 4/27 is part of Cornerstone's final slide into bankruptcy.

13. Between March 8, 2016, and May 9, 2016, LG received $19,242.43 in payments from Cornerstone, withdrawn directly from Cornerstone's bank account pursuant to the MCA, leaving a balance due to LG of $46,654.57.

14. A standard provision of LG's standard contract at ¶ 1.9 states in relevant part:

**1.9 Sale of Receipts**. [Cornerstone] and LG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount [interests in the accounts receivable] and that such Purchase Price is not intended to be, nor shall be construed as, a loan from LG to [Cornerstone].

15. The MCA included a security agreement in which Cornerstone granted LG a security interest in

    (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by [Cornerstone]; and (b) all proceeds, as that term is defined by Article 9 of the UCC[.]

-4-

16. The MCA also included a personal guaranty of Cornerstone's performance under the security agreement and MCA.

17. In addition to LG, Cornerstone entered into an MCA agreement with EBF Partners, LLC, dated March 18, 2016, whereby Cornerstone sold $105,000 of its receivables for an up-front payment of $75,000, with the amount purchased to be collected by debiting $875 per business day from Cornerstone's account, which was intended to approximate 15% of Cornerstone's receipts until the amount purchased would be received in full.

18. Cornerstone also obtained funding by entering into a Loan and Security Agreement with Kalamata Capital LLC ("Kalamata"), dated November 27, 2015, whereby Cornerstone borrowed $390,000 and agreed to repay $497,250 by paying $2,071.88 per business day.

19. Cornerstone also entered into a Promissory Note and Security Agreement with Windset Capital Corporation ("Windset"), dated February 23, 2016, whereby Cornerstone borrowed $100,000 and agreed to repay $140,999.04 by paying $559.52 per business day.

20. LG did not file a proof of claim in the bankruptcy case, but it is listed as an unsecured creditor under the confirmed plan.

21. LG never took any action to exclude any portion of Cornerstone's receivables from the bankruptcy estate.

22. LG had no previous relationship with Cornerstone or with any of its owners or insiders prior to the time that LG and Cornerstone started doing business together.

23. LG is not an insider of Cornerstone, and no one at Cornerstone is an insider of LG.

24. Cornerstone has not in any way received special treatment from LG.

25. LG's employees and agents did not know Cornerstone prior to doing business together.

26. LG is in the business of providing MCAs to businesses.

27. LG does not do any other business aside from MCAs and does not provide any other kinds of financing to businesses.

28. Prior to the petition date, Cornerstone transacted business with LG, on account of which Cornerstone was indebted to LG.

29. Cornerstone's bankruptcy schedules declare that, on the bankruptcy filing date, Cornerstone had total asset values of $1,566,097.28 and total debts of $2,593,694.93, leaving the debtor insolvent at that time by more than a million dollars.

This action was brought to avoid and recover allegedly preferential transfers under §§ 547 and 550 of the Bankruptcy Code. The preference statute is in place to protect debtors and ensure an orderly distribution of assets.

> "Under the Bankruptcy Code's preference avoidance section, 11 U.S.C. § 547, the trustee is permitted to recover, with certain exceptions, transfers of property made by the debtor within 90 days before the date the bankruptcy petition was filed." *Barnhill v. Johnson*, 503 U.S. 393, 394, 112 S. Ct. 1386, 118 L. Ed. 2d 39 (1992). "This rule 'is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy.'" *Lindquist v. Dorholt (In re Dorholt, Inc.)*, 224 F.3d 871, 873 (8th Cir. 2000) (quoting *Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 326 (8th Cir. 1997)).

> "Title 11 U.S.C. § 547(b) requires that in order for a transfer to be subject to avoidance as a preference, (1) there must be a transfer of an interest of the debtor in property, (2) on account of an antecedent debt, (3) to or for the benefit of a creditor, (4) made while the debtor was insolvent, (5) within 90 days prior to the commencement of the bankruptcy case, (6) that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation." *Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.)*, 986 F.2d 228, 230 (8th Cir. 1993). The trustee must establish each of these elements by a preponderance of the evidence. *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (8th Cir. B.A.P. 2000).

*Wells Fargo Home Mortgage, Inc. v. Lindquist*, 592 F.3d 838, 842 (8th Cir. 2010).

The Committee frames the issue with the elements of § 547(b), and LG does not dispute the applicability of those elements. Instead, LG asserts as a threshold issue that the agreement is a true sale of receivables and not a loan. In the alternative, LG relies on the ordinary-course-of-business defense in § 547(c)(2). The nature of the agreement is a legal question for the court. The § 547(c)(2) defense, as discussed below, requires a factual inquiry and cannot be decided on summary judgment.

In the Eighth Circuit, the governing law on the sale vs. loan question is *Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325 (B.A.P. 8th Cir.), *aff'd*, 652 F.3d 933 (8th Cir. 2011), where the Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling that the

recourse provisions in Inova's invoice purchase agreement placed the risk of non-collection on Qualia, so the agreement was a disguised loan rather than a true sale.

In contrast to Inova's agreement and its explicit recourse provisions, LG's agreement does not contain any such language. Rather, it specifically states that it is intended to be a sale and not a loan:

> 1.9 **Sale of Receipts.** [Cornerstone] and LG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be, construed as a loan from LG to [Cornerstone]. [Cornerstone] agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts [sic]. LG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to LG in respect to the full amount of the Receipts shall be conditioned upon [Cornerstone's] sale of products and services and the payment therefore by [Cornerstone's] customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that LG has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and LG shall promptly refund to [Cornerstone] any interest received by LG in excess of the maximum lawful rate, it being intended that [Cornerstone] not pay or contract to pay, and that LG not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by [Cornerstone] under applicable law.

Fil. No. 1, Ex. A.

"To constitute a bona fide factoring agreement under New York law,[1] the factor need only assume the risk that the seller's account debtor will be unable to pay." *Dryden Advisory Group, LLC v. Beneficial Mut. Sav. Bank (In re Dryden Advisory Group, LLC)*, 534 B.R. 612, 621 (Bankr. M.D. Pa. 2015) (footnote modified) (citing *Wechsler v. Hunt Health Sys., Ltd.*, 198 F. Supp. 2d 508, 519-20 (S.D.N.Y. 2002)).

Other courts look to additional factors when conducting a sale-or-loan analysis:

> The factors identified by various courts to find that a sale of receivables is in reality a loan are:

---

[1]The agreement states, and the parties agree, that New York law applies. Merchant Agreement Terms & Conditions, ¶ 4.5 (Fil. No. 1, Ex. A).

      1. Language of the documents and conduct of the parties.

      2. Recourse to the seller.

      3. Seller's retention of servicing and commingling of proceeds.

      4. Purchaser's failure to investigate the credit of the account debtor.

      5. Seller's right to excess collections.

      6. Purchaser's right to alter pricing terms.

      7. Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.

      8. Seller's retention of right to repurchase asset.

*Wawel Sav. Bank v. Jersey Tractor Trailer Training, Inc. (In re Jersey Tractor Trailer Training, Inc.)*, No. 06-02003 (MBK), 2007 WL 2892956, at *7 (Bankr. D.N.J. Sept. 28, 2007) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186-94 (1991)), *aff'd*, No. ADV 06-2003 (MBK), 2008 WL 2783342 (D.N.J. July 15, 2008), *aff'd in part, vacated in part, remanded*, 580 F.3d 147 (3d Cir. 2009).

No single factor is conclusive to the analysis and all the attributes of the transaction must be examined, but the allocation of risk is primary to the determination. *Classic Harvest LLC v. Freshworks LLC*, Case No. 1:15-CV-2988-WSD, 2017 WL 3971192, at *8 n.15 (N.D. Ga. Sept. 7, 2017) (citing *Dryden* 534 B.R. at 620).

The factors listed above tend to weigh in LG's favor and support a finding that the transaction was a true sale. With regard to the first factor – document language and party conduct – the document clearly states it was a sale and not a loan, and there is no evidence the parties operated to the contrary.

With regard to the third factor – Cornerstone's retention of servicing and commingling of proceeds – Cornerstone was obligated under the agreement to collect and deposit the receivables and permit LG to make daily withdrawals of the contract percentage, up to the designated maximum of $10,982 per month.

For the fourth factor – the purchaser's failure to investigate the credit of account debtors – there is no evidence regarding whether LG investigated any of Cornerstone's account debtors.

As to the fifth factor – Cornerstone's right to excess collections – LG could withdraw only a designated percentage from Cornerstone's bank account, and the withdrawals had a monthly cap. The balance remained in Cornerstone's possession.

With regard to the sixth factor – the purchaser's right to alter pricing terms – nothing in the agreement gives LG the authority to unilaterally change the purchase price.

As to the seventh factor – Cornerstone's right to alter or compromise unilaterally the terms of the transferred assets – Cornerstone specifically assigned those rights to LG by agreeing to irrevocably appoint LG as its agent and attorney-in-fact with full authority to, among other things, collect the amounts due under the agreement from customers or account debtors.

For the eighth factor – Cornerstone's right to repurchase assets – there is no provision in the agreement for Cornerstone to buy back its accounts.

The second factor listed above – recourse – warrants a more extensive discussion. Recourse requirements in a contract, which may be characterized as repurchase obligations, collectibility guarantees, or reserves from the purchase price to be released only as receivables come in, often are viewed as indicative of a loan rather than a sale. "'Recourse' refers . . . to the liability of a seller of receivables to the purchaser if the underlying obligors fail to pay the receivables." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 925 (10th Cir. 2004). "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (decided in the PACA context). "If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Id.*

In the parties' agreement in this case, there is no designated provision for recourse against Cornerstone as there was in the *Qualia* case, where Qualia was obligated to buy back any account for various reasons, including default by Qualia. However, Cornerstone did execute a blanket security agreement for LG, and Cornerstone's president signed a personal guaranty of Cornerstone's performance. The agreement provides certain protections for LG against default or adverse action by Cornerstone:

> The following Protections 1 through 8 may be invoked by LG, immediately and without notice to [Cornerstone] in the event:
> (a) [Cornerstone] takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of [Cornerstone's] services and products . . .
> (b) [Cornerstone] changes its arrangements with Processor in any way that is adverse to LG;
> (c) [Cornerstone] changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of [Cornerstone's] check transactions to another processor;

(d) [Cornerstone] interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers [sic] or otherwise conveys its business or assets without (i) the express prior written consent of LG, and (ii) the written agreement of any purchaser or transferee to the assumption of all of [Cornerstone's] obligations under this Agreement pursuant to documentation satisfactory to LG; or

(e) [Cornerstone] takes any action, fails to take any action, or offers any incentive – economic or otherwise – the result of which will be to induce any customer or customers to pay for [Cornerstone's] services with any means other than checks that are settled through Processor.

These protections are in addition to any other remedies available to LG at law, in equity or otherwise pursuant to this Agreement.

Protection 1: The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately.

Protection 2. LG may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s).

Protection 3. [Cornerstone] shall, upon execution of this Agreement, deliver to LG an executed confession of judgment in favor of LG in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, LG may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon.

Protection 4. LG may enforce its security interest in the Collateral identified in the Security Agreement herein.

Protection 5. LG may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which LG shall recover judgment against [Cornerstone], [Cornerstone] shall be liable for all of LG's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

Protection 6. [Cornerstone] shall, upon execution of this Agreement, deliver to LG an executed assignment of lease of [Cornerstone's] premises in favor of LG. Upon breach of any provision in this paragraph 1.11. LG may exercise its rights under such assignment of lease.

Protection 7. LG may debit [Cornerstone's] depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on

[Cornerstone's] bank account or otherwise, in an amount consistent with the Specified Percentage or Specific Daily Amount.

Protection 8. LG shall have the right, without waiving any of its rights and remedies and without notice to [Cornerstone] and/or Guarantor(s), to notify [Cornerstone's] credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to LG of all or any portion of the amounts received by such credit card processor on behalf of [Cornerstone]. [Cornerstone] hereby grants to LG an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints LG or any of LG's representatives as [Cornerstone's] attorney-in-fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to LG as contemplated by this Section.

Merchant Agreement Terms & Conditions ¶ 1.11 (Fil. No. 1, Ex. A) (formatting modified for legibility).

The agreement goes on to define events of default entitling LG to take steps to protect its rights:

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) [Cornerstone] shall violate any term or covenant in this Agreement; (b) Any representation or warranty by [Cornerstone] in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) [Cornerstone] shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against [Cornerstone] seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor(s); (e) [Cornerstone] shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) [Cornerstone] shall transfer or sell all or substantially all of its assets; (h) [sic] [Cornerstone] shall make or send notice of any intended bulk sale or transfer by [Cornerstone]; (i) [Cornerstone] shall use multiple depository accounts without the prior written consent of LG; (j) [Cornerstone] shall change its depositing account without the prior written consent of LG; (k) [Cornerstone] shall perform any act that reduces the value of any Collateral granted under this Agreement; (l) [Cornerstone] shall default under any of the terms, covenants and conditions of any other agreement with LG; or (m) [Cornerstone] shall fail to deposit its Receipts into the Account.

*Id.*, ¶ 3.1.

Nothing in the agreement can be construed to be an obligation to repurchase accounts, a guarantee of the collectibility of individual accounts, a reserve to be released only when receivables are paid, or any other sort of recourse. LG can withdraw only a percentage of daily receipts; if there are no receipts on a particular day, no funds go to LG. The security agreement and personal guaranty come into effect only in

the event of default by Cornerstone, which addresses such significant situations as Cornerstone going out of business, selling its assets, not making its receivables available to LG, or otherwise harming LG's interest. Under the terms of the parties' agreement, LG does not have a right of recourse. Even Cornerstone's collection and servicing of the accounts receivable on LG's behalf does not mean the agreement is a loan. Under New York law, "a seller's retention of servicing in a factoring agreement does not require that the agreement be recharacterized as a loan because it does not alter the division of risk." *Dryden*, 534 B.R. at 624 (citing *Wechsler* 198 F. Supp. 2d at 519-20).

Therefore, the court finds that the agreement in this case is properly classified as a sale rather than a loan. Regardless of whether the transaction is a true sale or a loan arrangement, LG's failure to perfect its security interest means the debtor retained its rights and title to the accounts, so they are property of the bankruptcy estate. N.Y. U.C.C. Law § 9-318 (McKinney) ("For purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor that has sold an account or chattel paper, while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold."); *Qualia*, 441 B.R. at 331 n.3.

LG does not dispute any of the elements of preferential transfers under § 547(b) – that Cornerstone transferred money to LG within 90 days before the bankruptcy petition was filed, while Cornerstone was insolvent, and the transfers were in payment of an antecedent debt and enabled LG to receive more than it would have if the transfer had not been made. Instead, LG goes straight to the ordinary-course-of-business defense.[2] A trustee may not avoid a transfer made for a debt (1) "incurred by the debtor in the

---

[2]A recent case concerning LG's MCAs with an Illinois debtor explained that finding the transaction is a sale rather than a loan does not enjoin the preference analysis:

> The fact that the transactions in this matter do not constitute loans, however, does not mean that Network Salon did not owe a debt to LG Funding. In fact, in litigation in which LG Funding has been involved, New York courts describe the money owed by a merchant in a cash advance transaction as a debt. *See, e.g.*, *LG Funding, LLC v. Fla. Tilt, Inc.*, No. 15-CV-631(PKC)(VMS), 2015 WL 4390453, at *4 (E.D.N.Y. July 15, 2015) ("Along with FTI, Cartaya has not paid the debt owed by FTI and thus has breached that guaranty.") Further, the Bankruptcy Code defines a debt as a liability on a claim. 11 U.S.C. § 101(12). A "claim" within the meaning of the Bankruptcy Code is either a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment[.]" 11 U.S.C. § 101(5). LG Funding does not argue that it had no right to payment, and, in fact, argues the opposite – that it had the right to
>
> (continued...)

ordinary course of business" of both parties, and (2) paid "in the ordinary course of business" of the debtor and transferee or "according to ordinary business terms." § 547(c)(2). The transferee bears the burden of establishing the ordinary-course-of-business defense by a preponderance of the evidence. *Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys., Inc.)*, 460 F.3d 1041, 1044 (8th Cir. 2006).

"[T]he court must engage in a peculiarly factual analysis" to determine whether a preferential transfer was made within the ordinary course of business between the parties because there is no precise legal test to apply. *Cox v. Momar Inc. (In re Affiliated Foods Sw. Inc.)*, 750 F.3d 714, 719 (8th Cir. 2014). The purpose of this exception to the preference statute is "to leave undisturbed normal financial relations." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 527 (8th Cir. 2002) (quoting *Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.)*, 153 F.3d 902, 904 (8th Cir.1998)). The court must construe the exception narrowly, "because it places one creditor on better footing than all other creditors." *Id.* (citing *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir. 1996)).

Most of the time, the analysis focuses on the historical aspect of the parties' transactions with each other and whether the transfers at issue were made in the ordinary course of business between the parties prior to the debtor's financial difficulties: "'[T]he cornerstone' of the inquiry is that the creditor must demonstrate 'some consistency with other business transactions between the debtor and the creditor.'" *Affiliated Foods Sw. Inc.*, 750 F.3d at 719 (quoting *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991)) and noting that "the analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day [preference] period reflected 'some consistency' with that practice." *Id.* (quoting *Lovett*, 931 F.3d at 498).

If the parties do not have a lengthy history of doing business together, "'the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance.'" *Gecker v. LG Funding, LLC (In re Hill)*, 589 B.R. 614, 627 (Bankr. N.D. Ill. 2018) (quoting *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003)).

The term "ordinary course of business" implies that the debts were incurred in the routine operations of the debtor and the creditor. *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) (citing *Youthland, Inc. v. Sunshine Girls of Florida, Inc. (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993)). A debt will be considered not

---

[2](...continued)
debit Network Salon's account under the Agreements. Thus, while New York law does not define the Agreements as loans, the transactions created a debt that Network Salon owed to LG Funding.

*Gecker v. LG Funding, LLC (In re Hill)*, 589 B.R. 614, 622 (Bankr. N.D. Ill. 2018).

incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arm's-length commercial transaction. *Id.* (citing *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988); *In re Valley Steel Corp.*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995); and *McCullough v. Garland (In re Jackson)*, 90 B.R. 793, 794 (Bankr. D.S.C. 1988)).

LG and Cornerstone entered into this MCA approximately two-and-a-half months before Cornerstone filed for bankruptcy protection.[3] Therefore, the parties do not have a baseline history of "routine" or ordinary transactions as a layman would understand those terms – their transactions occurred only while Cornerstone was in financial straits. LG was one of four creditors with whom Cornerstone either borrowed money or sold receivables within six months before the petition date.

LG and its same MCA contract recently prevailed in a similar lawsuit in bankruptcy court in Illinois. *Gecker v. LG Funding, LLC (In re Hill)*, 589 B.R. 614 (Bankr. N.D. Ill. 2018). Notably, however, the debtor in that case had been using MCA financing from various companies for several years before filing bankruptcy. Cornerstone utilized such funding for only a few months prior to bankruptcy. More importantly, the *Hill* case was decided after a trial in which the debtor testified as to her business practices and her familiarity with and use of MCAs.

---

[3]It is worth noting that the ordinary-course-of-business exception can apply even when the parties do not have a track record of prior dealings. Even first-time transactions can qualify. *See Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys. Inc.)*, 482 F.3d 1118, 1125 (9th Cir. 2007) ("We agree that first-time transactions may satisfy the requirements of [the exception]."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003); *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time.").

As the Tenth Circuit Court of Appeals stated:

 [W] agree with the Seventh Circuit that "'the court can imagine little (short of the certain knowledge that its debt will not be paid) that would discourage a potential creditor from extending credit to a new customer in questionable financial circumstances more than the knowledge that it would not even be able to raise the ordinary course of business defense, if it is subsequently sued to recover an alleged preference.'" *Kleven*, 334 F.3d at 643 (quoting *Warsco v. Household Bank F.S.B.*, 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002)).

 *Jubber v. SMC Elec. Prod., Inc. (In re C.W. Min. Co.)*, 798 F.3d 983, 989 (10th Cir. 2015).

As noted earlier in this order, the court must undertake a particularly fact-based inquiry into the applicability of § 547(c)(2). Such an inquiry is especially important here where there is no evidence from the debtor regarding the parties' business relationship, and the Committee objects to LG's evidence of its transactions with Cornerstone and the MCA business in general. *See* Pl's Brf. at 29-30, objecting to ¶¶ 11-36 of the Aff. of Joseph Lerman. Accordingly, the issue of whether the transfers were made in the ordinary course of business will be set for trial.

IT IS ORDERED: The motion for summary judgment filed by the Official Committee of Unsecured Creditors (Fil. No. 14) is denied. The motion for summary judgment filed by LG Funding, LLC (Fil. No. 11) is denied. The Clerk shall schedule this matter for trial.

DATED: November 9, 2018.

BY THE COURT:

/s/Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Elizabeth A. Hoffman
    *Donald L. Swanson
    *Gene W. Rosen
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.